**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
**HANY SALIB and PETER FAHIM,**

                           **Plaintiffs,**

    - against -

**P&O PORTS NORTH AMERICA, INC,**

                           **Defendant.**
-------------------------------------------------------------------x

                                  **OPINION AND ORDER**

                                **05 CV 5313 (NG) (MDG)**

**GERSHON, United States District Judge:**

       Plaintiffs Hany Salib and Peter Fahim are Coptic Christians who were formerly employed by defendant P&O Ports North America, Inc. ("POPNA") as security guards. They bring this action alleging discrimination on the basis of their religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL"). In short, plaintiffs claim that Muslim security guards were treated preferentially during the course of their employment, particularly with respect to defendant's decision to terminate certain security guards in March 2005. Defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons discussed below, defendant's motion is granted.

**FACTS**

       Unless otherwise indicated, the following facts are undisputed.[1]

---

[1] Plaintiffs' response to defendant's statement of facts does not comply with Local Civil Rule 56.1, which requires the nonmoving party to controvert each statement of material fact offered by the moving party with a proper citation to admissible evidence. *See* Local Civ. R. 56.1(c), (d). In several instances, plaintiffs also challenge defendant's statement of facts on the ground that it has cited to depositions of "interested witnesses" whose testimony the jury would be "entitled to disbelieve . . . pursuant to *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

POPNA is a corporation in the business of terminal operations, stevedoring, and port development. The company maintains an equal employment opportunity policy that prohibits discrimination on the basis of, *inter alia*, race, national origin, creed, and religion. In addition to publishing its policy in the company's "Associate's Guide," POPNA posts copies of the federal equal opportunity policy throughout its facilities.

At all relevant times, POPNA's practice with respect to hiring security guards has been to select individuals from the Port Police & Guards Union ("PPGU"), whose members are subject to the terms of the collective bargaining agreement between the New York Shipping Association ("NYSA") and the PPGU (the "CBA"). Similar to POPNA's equal employment opportunity policy, the CBA sets forth an anti-discrimination statement that prohibits discrimination by the parties to the agreement.

Upon hire, and in accordance with the requirement of the New York Harbor Waterfront Commission (the "Commission") that all port security guards possess sponsorship from their employer, POPNA issues to its security guards a certification of sponsorship. Certified security guards are further categorized according to a three-tiered classification system. A new hire begins as a "Casual" security guard and is elevated to "Extra" status upon the company's request; an Extra who then works 1,000 hours within a calendar year is automatically reclassified as a "Regular." Under the Commission's "Port Watchman Rules and Regulations" (the "Rules")

---

133, 151 (2000)." Plaintiffs' objection is correct only to the extent that it is the province of the jury to weigh the evidence, make credibility determinations, and draw inferences from the facts. *See Reeves*, 530 U.S. at 150-51. However, that an "interested witness" has testified to a certain issue does not, in and of itself, raise a genuine issue of material fact. While the court will not "try issues of fact . . . [it will] determine whether there are issues to be tried." *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir.1987) (internal quotation marks omitted). Irrespective of the propriety of plaintiffs' objections to defendant's statement of undisputed facts, the court has independently reviewed the record to determine whether there are factual issues in dispute.

and the CBA, the "Roundsman," a fellow PPGU member who dispatches the work assignments, is required to exhaust all of the company's Regulars, then its Extras, and finally its Casuals when calling individuals regarding work opportunities. Given their relative priority among all security guards, Regulars are offered more opportunities to work than Extras or Casuals. The responsibilities of all POPNA security guards include monitoring various areas within and outside the port, directing traffic, carrying luggage, and operating x-ray machines.

## I.     Hany Salib's Employment at POPNA

Mr. Salib began working at POPNA as a Casual in June 2002 when the Roundsman at the time, Mohamed Arbab, a Muslim employee, contacted him with a work opportunity. By March 4, 2004, Mr. Salib was number 39 out of 47 individuals on the Regular call list and thereby had priority to accept work assignments over all Casuals and Extras as well as over those Regulars who were less senior than himself. As a Regular, Mr. Salib generally had the opportunity to work seven days per week during the summer and up to five days per week during the winter.

From 2002 to 2004, Mr. Salib worked over 1,000 hours each year. From June 2002 to the end of the calendar year, Mr. Salib worked 752 straight hours and 382 overtime hours. In 2003, Mr. Salib worked 544 straight hours and 573 overtime hours, and, in 2004, he worked 352 straight hours and 742 overtime hours. Then, in 2005, specifically from December 27, 2004 to March 20, 2005, Mr. Salib worked fewer hours at POPNA than in any of his previous years, logging 16 straight hours and 28 overtime hours.[2]

---

[2]   The date range reflects the period in 2005 during which Mr. Salib was sponsored by POPNA. Although Mr. Salib's sponsorship was revoked on March 22, 2005, he continued to work for POPNA until April 24, 2005. From the time his sponsorship was revoked until he discontinued working at POPNA, Mr. Salib worked an additional eight straight hours and eight overtime hours, bringing his total hours worked in 2005 to 24 straight hours and 36 overtime hours.

In early or mid-January of 2005, Mr. Arbab called Mr. Salib to tell him that, as a Regular, he needed to make himself more available for work. However, from January 10, 2005 to February 14, 2005, Mr. Salib refused all work assignments offered to him because of immigration issues affecting his license to work. Then, from February 14, 2005 to April 16, 2005, Mr. Salib refused any work assignments scheduled during the main shift hours, from 8:00 a.m. to 4:00 p.m., because of conflicts with his other, full-time job and refused certain weeknight and weekend shifts because of his preparations for an engineering exam he was scheduled to take on April 16, 2005. At the time, Mr. Salib held a full-time job as a housing inspector for the City of New York and worked every weekday from 8:00 a.m. to 4:00 p.m as well as on a few Saturdays. Previous to this job, which he began in June 2004, Mr. Salib had also worked for two different construction inspection companies from November 2002 until June 2004.

During the course of his employment at POPNA, Mr. Salib received most of his assignments from Mr. Arbab but never filed an official grievance about being denied the opportunity to work overtime. On at least a few occasions, however, Mr. Salib did ask Mr. Arbab to provide him with more opportunities to work. In one instance, Mr. Salib asked Mr. Arbab if he could start shifts earlier in order to earn overtime pay, but Mr. Arbab replied that he could not because he was not needed earlier than the designated shift start time. In another instance, Mr. Salib asked Mr. Arbab to assign him longer hours so that he could fulfill the requisite 1,000 hours to become a Regular security guard. Mr. Arbab suggested to him that he take more days off from his full-time job with the City of New York in order to be more available for work at POPNA. In accordance with the suggestion, Mr. Salib took days off from his primary job, and Mr. Arbab provided him the hours he needed to fulfill the 1,000-hour requirement.

## II.    Peter Fahim's Employment at POPNA

Mr. Fahim began working at POPNA as a Casual security guard when Mr. Arbab first contacted him for work in June 2002.  In February 2003, Mr. Fahim became an Extra and, approximately one year later, became a Regular security guard.  Mr. Fahim testified that he believed it was Mr. Arbab who selected him to become an Extra and that it was Mr. Arbab who also assigned him enough hours to become a Regular.  By March 4, 2004, Mr. Fahim was number 37 out of 47 individuals on the Regular call list.

In 2002, from the start of his employment in June to the end of that year, Mr. Fahim worked 936 straight hours and 463 overtime hours.  In 2003, he worked 1176 straight hours and 733 overtime hours, and, in 2004, he worked 400 straight hours and 806 overtime hours.  In 2005, Mr. Fahim worked fewer hours than in any of his previous years at POPNA; from December 27, 2004 to March 20, 2005, Mr. Fahim worked a total of nine days on the weekends, logging 72 hours in overtime.  Mr. Fahim testified that he received calls for work opportunities during those months, but he did not accept any assignments scheduled during the daytime.  Mr. Fahim also refused assignments during the month of March because he was studying for the same exam Mr. Salib was preparing to take on April 16, 2005.[3]  Like Mr. Salib, Mr. Fahim also held other jobs while he worked at POPNA.  In the summer of 2004, during the last year of his employment, Mr. Fahim worked with a contractor for approximately one month before securing a full-time job, working every weekday from 8:00 a.m. to 4:00 p.m., as an electrical designer at an engineering firm until August 2005.

---

[3]  Mr. Fahim testified during his deposition that he did not remember whether he turned down work assignments during March 2005 because of his preparations for the engineering exam.  He, however, expressly indicated in his charge to the EEOC that he was not available to work for a full month in 2005 because he was studying for this exam.

During the course of his employment, Mr. Fahim never requested a leave of absence from work or asked anyone at the company to assign him more hours. Mr. Fahim received most of his assignments from Mr. Arbab, or, at times, from Michael O'Keefe, but he did not file an official grievance against any POPNA supervisor regarding any discriminatory practices. On one occasion, however, Mr. Fahim complained to Mr. Arbab about the fact that another security guard with less seniority than he had appeared to be working more hours on that particular day and that he needed to work the extra shift as well. Mr. Arbab responded by sending Mr. Fahim on the same assignment, giving him the opportunity to work additional hours that day.

## III. Revocation of Plaintiffs' Sponsorships

In March 2005, Mr. Arbab's manager, Richard Karczewski, decided to evaluate POPNA's security guard call lists and withdraw its sponsorship of those individuals who were not making themselves available for work. During his deposition, Mr. Karczewski explained that the company was often short on staffing security guards even though they had recently sponsored a number of guards, and there were approximately 50 Regulars and 30 Extras on its call list. When Mr. Arbab informed Mr. Karczewski that the shortage was caused by many of the guards not making themselves available for work, Mr. Karczewski asked Mr. Arbab to give him "a list of all the guards who were not making themselves readily available." He, however, did not explicitly inform Mr. Arbab about why he wanted the list or what he would do with the individuals on the list.

Mr. Arbab testified that, for the most part, he had personal knowledge about which guards were making themselves available or unavailable for work. To make sure he was giving Mr. Karczewski the correct information, especially for those individuals he was unsure of, Mr. Arbab consulted payroll records to confirm his information. In constructing the list, Mr. Arbab

testified that he not only considered the number of hours worked but also other factors such as whether the individual had actual opportunities to work, determined in part by his security guard classification, seniority, and/or excuses approved by the company, such as vacation time or leaves of absence.

At some point prior to submitting the list to Mr. Karczewski, Mr. Arbab called Mr. Salib to inform him that he was asked to put together a list of unavailable security guards and that Mr. Salib's name would be included on the list. Although Mr. Salib's informed Mr. Arbab that he was unable to work because of his full-time job and his preparations for an exam, Mr. Arbab explained that, regardless of the reason, he could not lie to his boss and that he was required to submit Mr. Salib's name. Mr. Arbab also attempted to call Mr. Fahim to give him the same information but was unable to reach him.

Mr. Arbab provided to Mr. Karczewski a list of 28 security guards, inclusive of Mr. Salib and Mr. Fahim, whom he determined were not making themselves available for work. During their depositions, plaintiffs identified individuals on the list as being composed of males and females of various religions, including Muslims and Coptic Christians.[4]

On March 22, 2005, Mr. Karzweski submitted a letter to the Commission, withdrawing POPNA's sponsorship of all 28 individuals who were on Mr. Arbab's list. By letters dated April 27, 2005, the Commission canceled Mr. Salib's and Mr. Fahim's security officer permits given their lack of employer sponsorship and advised each that he is "no longer permitted to act or be employed as a security officer within the Port of New York District." Plaintiffs' employment with POPNA was effectively terminated as of that date.

---

[4] POPNA does not collect or maintain any records of its employees' religious affiliation. The religions of the individuals on the security guard list are based on the personal knowledge of plaintiffs and as identified by them during their depositions.

In May of 2005, Mr. Salib filed a grievance about the withdrawal of his sponsorship, specifically nothing that he was placing a complaint against Mr. Karczewski for failing to provide him "any warning" or "a reasonable explanation" about the revocation of his sponsorship.[5] The grievance did not allege any charges of discrimination and, despite their knowledge of the grievance process, neither Mr. Salib nor Mr. Fahim filed any other complaint or grievance against Mr. Arbab for his allegedly discriminatory practices. Both plaintiffs also testified during their depositions that Mr. Arbab never spoke about religion, nor did he make any derogatory remarks to them about religion.

**PROCEDURAL HISTORY**

On or about June 13, 2005, Mr. Salib filed a charge with the New York Division of Human Rights ("NYDHR"), alleging discrimination on the basis of creed and national origin in violation of the NYSHRL. Specifically, Mr. Salib alleged that Mr. Arbab "subjected [him] to disparate treatment by assigning [him] heavier tasks than he assigned Muslim employees and employees who are not of Egyptian national origin" and "showed favoritism toward the Muslim employees by assigning them more overtime work." On July 15, 2005, POPNA submitted its position statement, arguing that its decision to withdraw Mr. Salib's sponsorship was based on "his failure to make himself available for work, [as] well documented by business records." POPNA denied that it was motivated by any discriminatory intent and noted that "notwithstanding his creed and national origin, Mr. Salib worked the fewest hours since January 2005 and failed to make himself available for work." The NYDHR sent to Mr. Salib a copy of POPNA's position statement and requested that he submit a rebuttal to the material; the letter

_____

[5] The CBA sets forth a detailed procedure for dealing with disputes, claims, or grievances arising out of employment. In short, grievances must be first discussed at the "pier level" in an effort at reaching settlement. If these initial efforts fail, the grievance is referred to the Labor Relations Board within 30 days for a decision.

dated July 15, 2005 indicated that, in the event Mr. Salib did not respond by July 25, 2005 or request an extension by that date, the NYDHR would consider the file complete and "assume [Mr. Salib has] nothing to add, or that [he does] not wish to cooperate further in the investigation of [his] case." Plaintiff did not submit a response. Rather, by letter dated August 19, 2005, plaintiffs' counsel requested that Mr. Salib's charge with the NYDHR be transferred to the EEOC.

Mr. Fahim filed a similar charge with the EEOC on or about August 26, 2005, alleging that Mr. Arbab "has been consistently tolerant of periods of unavailability of Muslim employees" and that he has "consistently favored Muslim employees in terms of work assignments and scheduling." The EEOC requested from defendant a position statement along with any supporting documentation addressing the allegations raised by Mr. Fahim in his charge of discrimination. On September 23, 2005, POPNA submitted its position statement containing largely the same content and argument as its statement responding to Mr. Salib's charge of discrimination. Specifically, POPNA noted that, in addition to being unavailable "for work and demonstrat[ing] a lack of commitment to the job and the Company[,] . . . Mr. Fahim . . . worked the second fewest hours of all 'regular' security guards."

On September 30, 2005 and October 31, 2005, the EEOC issued a Dismissal and Notice of Rights to Mr. Fahim and Mr. Salib, respectively, finding that there was insufficient evidence to support the allegations of discrimination against Mr. Arbab and/or POPNA. The EEOC found that the documentary evidence, which included payroll records, and the statements of two other Coptic Christian security guards disclaiming discriminatory practices by Mr. Arbab, all indicated that POPNA decided to terminate plaintiffs' employment based upon legitimate, nondiscriminatory business reasons.

On November 10, 2005, plaintiffs commenced this action, alleging that POPNA discriminated against them on the basis of their religion in violation of Title VII, the NYSHRL, and the NYCHRL, and seeking back, front and/or other lost pay and benefits, compensatory damages, as well as liquidated and/or punitive damages. Specifically, plaintiffs claim lost wages in the amount of approximately $15,000 per year, as a result of the company's withdrawal of their sponsorship. By letter dated October 6, 2006, about five months after the May 15, 2006 deadline for application to amend the pleadings, plaintiffs revised their initial disclosures to claim additional lost wages arising out of allegedly discriminatory denial of overtime work; plaintiffs estimate that the losses amount to an additional $4,000 per plaintiff.[6]

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could

---

[6] In their letter, plaintiffs characterized the revision as "wages denied them by discriminatory allocation of work assignments" but they do not dispute defendant's statement that these wages were, more specifically, for allegedly discriminatory denial of overtime work. While plaintiffs appear to have presumed that the overtime claim was part and parcel of the work assignments claim, defendant believed the two claims to be distinct. During a telephone conference held on November 2, 2006, defendant accordingly objected to plaintiffs pursuing a claim based on the allegedly discriminatory denial of overtime work. At that time, by Order of Magistrate Judge Marilyn D. Go, dated April 13, 2007, the court extended the discovery deadline "to enable defendant to depose plaintiffs regarding job assignments, apparently a new claim of discrimination, and to permit plaintiffs to depose persons newly identified by defendant in its automatic disclosures." The court also noted at the time that plaintiffs have "fail[ed] throughout the course of this litigation to identify the nature of their claims and to pursue discovery on such claims in a timely fashion." *See also infra* n.7.

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the facts in the light most favorable to the non-moving party, and all reasonable inferences and ambiguities must be resolved against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Flanagan v. GE*, 242 F.3d 78, 83 (2d Cir. 2001). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), but "must come forward with specific facts showing that there is a genuine issue for trial", *Matsushita*, 475 U.S. at 586-8 (emphasis removed).

District courts are cautious about granting summary judgment when intent is at issue since "a victim of discrimination . . . is seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). However, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Therefore, summary judgment is appropriate where the standards of Rule 56 have been met. *Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d Cir. 2000).

## II.    Religious Discrimination

Plaintiffs' claims of religious discrimination, brought under Title VII, the NYSHRL, and the NYCHRL, are all analyzed under the three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Meiri v. Dacon*, 759 F.2d

989, 994-95 (2d Cir. 1985) (applying the *McDonnell Douglas* framework to a Title VII claim of religious discrimination); *see also Mack v. Otis Elevator Co.*, 216 F.3d 116, 122 n.2 (2d Cir. 2003) (holding that claims under the NYSHRL and NYCHRL are analyzed under the same substantive standards as claims brought under Title VII); *Payne v. MTA New York City Transit Authority*, 349 F. Supp. 2d 619, 629 (E.D.N.Y. 2004) (same).  First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.  *McDonnell Douglas*, 411 U.S. at 802-04.  Plaintiffs' burden of proof at this threshold step is minimal.  *Howley v. Stratford*, 217 F.3d 141, 150 (2d Cir. 2000). Second, if the plaintiff successfully proves a prima facie case, a presumption of unlawful discrimination arises and the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  *Id.*; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  Third, if the defendant carries this burden, the plaintiff must then have an opportunity to demonstrate that the proffered reason is in fact a pretext for intentional discrimination.  *McDonnell Douglas*, 411 U.S. at 802-04; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993).  At all times, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  *Burdine*, 450 U.S. at 253.

## III.    Plaintiffs' Claims of Discrimination

In this case, plaintiffs assert three claims of religious discrimination, alleging that, because they were Coptic Christian, defendant revoked their sponsorships, provided them fewer

opportunities to work overtime shifts, and dispatched less favorable types of work assignments to them.[7]

## A. Revocation of Sponsorship

Plaintiffs claim that, when Mr. Arbab put together the list of unavailable security guards for Mr. Karczewski, he included plaintiffs because they were Coptic Christians and not, as defendant argues, because they were actually unavailable to work. Plaintiffs further claim that Mr. Arbab did not include Muslim security guards who were similarly unavailable to work.

### 1. Prima Facie Case

Defendant does not challenge whether plaintiffs can establish the first three elements of a prima facie case of discrimination, arguing only that there is no evidence indicating that their terminations took place under circumstances giving rise to an inference of discrimination. Although there is no rigid rule about how a plaintiff can raise such an inference, "[c]ircumstances contributing to a permissible inference of discriminatory intent may include . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms, or its invidious comments about others in the employee's protected group, or the more favorable treatment of employees not in the protected group." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citations omitted); *see also Chertkova v. Connecticut General Life*

---

[7] As discussed above, plaintiffs have not clearly identified the claims they are asserting against the defendant. *See supra* n.6. In their Complaint, plaintiffs alleged that defendant's "less favorable treatment of plaintiffs" during the course of their employment and "revocation of plaintiffs' sponsorships" constituted unlawful discrimination. In their briefs opposing defendant's motion for summary judgment, plaintiffs appear to give shape to their "less favorable treatment" claim by arguing that defendant discriminated against them by giving Muslim employees better work assignments and more overtime opportunities. Although plaintiffs operate under the assumption that the work assignment and overtime allegations are part of the same claim, the allegations are distinct, as one set of allegations goes to the quality of work assignments and the other to the quantity. Accordingly, the court will treat these two claims, in addition to their claim of discriminatory termination, individually.

*Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996) (including "actions or remark made by decisionmakers that could be viewed as reflecting a discriminatory animus").

The record here contains no evidence that defendant—namely, Mr. Arbab, the only individual against whom plaintiffs allege discrimination—criticized plaintiffs regarding their performance in degrading terms on the basis of their religion or that he made invidious comments about Coptic Christians generally. Plaintiffs themselves testified that Mr. Arbab never made any discriminatory remarks to them or even spoke about religion generally during the course of their employment.

Plaintiffs instead attempt to raise an inference of discrimination by showing that the defendant treated "similarly situated" employees differently. While a showing of disparate treatment is "a common and especially effective method" of establishing a prima facie case of discrimination, *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001), the plaintiff must show that they were "similarly situated in all material respects" to those individuals with whom they seek to compare themselves, *Graham v. Long Island Rail Road*, 230 F.3d 34, 39 (2d Cir. 2000); *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63-64 (2d Cir. 1997). "What constitutes 'all material respects' . . . varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. In other words, there should be an objectively identifiable basis for comparability. Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Graham*, 230 F.3d at 40 (citations

and internal quotations marks omitted); *Norville v. Staten Island University Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999).

Although "[a] valid comparison between employees can only be made if they shared 'sufficient employment characteristics . . . so that they could be considered similarly situated,'" *Quarless v. Bronx-Lebanon Hospital Center*, 228 F. Supp. 2d 377, 383 (S.D.N.Y. 2002) (quoting *McGuinness*, 263 F.3d at 53), plaintiffs here produce no evidence from which such a comparison can be made.  Plaintiffs provide a list of five Muslim security guards and the number of hours that each of the individuals worked from January 1, 2005 to March 22, 2005, without identifying any other employment characteristics.  Taken alone, the time records are insufficient to establish that plaintiffs and the comparators are similarly situated in all material respects.  *See Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir. 1999) (holding that statistical evidence was "untenable" for purposes of raising an inference of discrimination when it made "no effort to account for nondiscriminatory explanations for the [claimed] disparity"); *Quarless v. Bronx-Lebanon Hospital Center*, 228 F. Supp. 2d 377, 384 (S.D.N.Y. 2002) (finding that "unanalyzed lists of the salaries of other . . . employees, without accounting for differences in education, seniority, performance, or specific work duties" did not establish that plaintiff was similarly situated to the comparators he claimed received larger salary increases than he did).

Defendant, on the other hand, produces a variety of evidence that plaintiffs ultimately cannot dispute to establish that the comparators were not similarly situated in all material respects.  The record indicates that two of the comparators, Manal E. Ahmen and Mohamed M. Ahmed, were not subject to the "same standards governing performance evaluation and discipline," *Mazzella v. RCA Global Communications, Inc.*, 642 F. Supp. 1531, 1547 (S.D.N.Y. 1986), because they were not officially sponsored by the company at the time plaintiffs'

sponsorships were revoked on March 22, 2005. Defendant submitted the sworn affidavit of Steve Loevsky, the General Manager of POPNA, stating that, when Ms. Ahmen and Mr. Ahmed began working as Casual security guards in January 2004 and February 2004, respectively, the Commission did not require individuals to have company sponsorships prior to obtaining a waterfront license. Mr. Loevsky noted that both employees were deemed sponsored only after working the requisite number of hours to qualify for the company's Regulars call list, approved on June 21, 2005.[8]

The record further establishes that none of the comparators could have engaged in conduct of comparable seriousness to plaintiffs because of "differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it." *Mazzella*, 228 F. Supp. at 1547; *see also Graham*, 230 F.3d at 40 ("The determination that two acts are of comparable seriousness requires—in addition to an examination of the acts—an examination of the context and surrounding circumstances in which those acts are evaluated."). It is undisputed that, as Regulars, plaintiffs had more opportunities to work than Extras and Casuals as well as those Regular security guards with lesser seniority than they. Plaintiffs also do not dispute that, while they were offered opportunities to work, they turned down these assignments in early 2005 because of scheduling conflicts with their full-time jobs and preparations for an engineering exam. Defendant establishes, and plaintiffs do not dispute, that four of the five comparators, namely, Ms. Ahmen, Mr. Ahmed, Hamib Mahgoub, and Mohamed I. Ibrahim, were classified as either Casuals or Extras, and they therefore did not have a

---

[8] Plaintiffs rely on a seniority list they received from the union, rather than the official seniority list signed by the company and produced during discovery, to dispute defendant's argument that Ms. Ahmen and Mr. Ahmed were not sponsored by the company during the relevant period. *See* Oral Arg. 9/24/08 Tr. at 14-17, 21-22. The record establishes that Ms. Ahemn and Mr. Ahmed appeared on the official company's seniority list for the first time several months after plaintiffs' sponsorships had been revoked.

comparable number of opportunities to work as Regulars. Indeed, as to Mr. Mahgoub, the undisputed evidence indicates that this comparator actually complained to Mr. Arbab about not receiving enough assignments despite his availability to work.

With respect to the fifth comparator, Abdelkarim Tagelkhatim,[9] defendant establishes that, though he was classified as a Regular, his absence from work during the early part of 2005 was not conduct of comparable seriousness to plaintiffs. As plaintiffs do not dispute, a security guard who was on vacation or a leave of absence would not be considered "unavailable" by the company. The record shows that Mr. Tagelkhatim requested and obtained an official leave of absence from Mr. Karczewski for a period of seven or eight weeks beginning in January 2005 so that he could return to his home in Sudan to be married there. Tagelkhatim Dep. at 11-13; *see also* Avallone Ex. B (Mr. Tagelkahtim's marriage certificate, dated Februrary 14, 2005). Plaintiffs fail to raise an issue of fact as to Mr. Tagelkhatim's leave of absence.[10] Furthermore, it is undisputed that Mr. Tagelkhatim was regularly available to work during the periods preceding and subsequent to his leave of absence; plaintiffs do not produce any evidence that Mr. Tagelkhatim refused work when he was not on an official leave of absence.

While plaintiffs' burden at the first step of *McDonnell Douglas* may be modest, plaintiffs have not put forward any evidence from which a reasonable jury could find an inference of discrimination. Plaintiffs cannot merely compare themselves to any individuals they choose and thereby manufacture instances of disparate treatment. Defendant established, and plaintiffs failed to dispute, that these comparators could not have been similarly situated in all material

---

[9] Mr. Tagelkhatim is also referred to in the record by the name Egaily Taj.

[10] As discussed below, plaintiffs do make an argument that Mr. Tagelkhatim was not on a leave of absence from the company, but they ultimately fail to raise an issue of material fact as to the evidence clearly established in the record. *See infra* pp. 19-20.

respects. Because plaintiffs fail to establish a prima facie case of discriminatory termination, summary judgment for defendant is appropriate.

### 2. Legitimate, Nondiscriminatory Reason

Even if plaintiffs were able to establish their prima facie case, defendant clearly satisfies its burden of production at the second step of the *McDonnell Douglas* analysis to articulate a legitimate, nondiscriminatory reason for its actions. Defendant has made clear, with record evidence, that the company withdrew plaintiffs' sponsorships and effectively terminated their employment at POPNA because they did not make themselves available for work. Plaintiffs themselves testified at their depositions that, from January to mid-March 2005, just prior to the revocation of their sponsorships, they were given opportunities to work but they refused them because of scheduling conflicts with their full-time jobs and their preparations for an engineering exam scheduled in April 2005. Both plaintiffs also testified that they did not ask for a vacation or a leave of absence from the company prior to refusing these work opportunities.

When an employer articulates a nondiscriminatory reason for its action, as defendant has done here, the presumption of discrimination "completely drops out of the picture" and "the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). An employer's "reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Hicks*, 509 U.S. at 512 (citation omitted). In the summary judgment context, this means the plaintiff must "establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for its decision to discharge is false and as to whether it is more likely that a discriminatory reason motivated the

employer to make the adverse employment decision." *Gallo v. Prudential Servs. Ltd.*, 22 F.3d 1219, 1225 (2d Cir. 1994).

According to plaintiffs, "there [is] ample evidence" from which to establish that unavailability could not be the real reason for their termination and, in support, they once again point to evidence of alleged disparate treatment as well as of instances in which the company allegedly has inaccurately represented its reasons for revoking certain security guards' sponsorships in March 2005. A showing of disparate treatment can serve as evidence establishing pretext, *Graham*, 230 F.3d at 43, but, as discussed above, plaintiffs have not raised any issues of fact with respect to defendant's evidence that the comparators are not similarly situated in all material respects. Plaintiffs do not dispute that four of the five comparators were either Extras or Casuals, or that Ms. Ahmen and Mr. Ahmed were not sponsored by defendant at the time plaintiffs' sponsorships were revoked. Although plaintiffs argue that the company did actually revoke the sponsorships of Casual security guards and therefore "the only possible explanation for the employer's failure to discharge Ms. Ahmen is . . . because she, like Mr. Arbab, is Muslim," the undisputed record establishes otherwise. The individuals who plaintiffs claim were Casuals were in fact sponsored by POPNA and considered Extras. Loevsky Aff. ¶ 10; Avallone Reply Aff. Ex. I at 5.

Plaintiffs' only challenge to the evidence is their belief that Mr. Tagelkhatim, the only comparator of similar seniority to them, could not have been on a leave of absence. In support, plaintiffs point to the deposition of Mr. Arbab in which he testified that he could not recall whether Mr. Tagelkhatim was on a leave of absence during the relevant time period and that, although he generally learned of leaves of absence through the union, the union did not have any written records of a leave of absence by any security guard during the relevant time period. The

fact that written documentation is required when an employee of POPNA other than a member of PPGU, requests vacation time—a factual distinction plaintiffs ignore—is irrelevant when plaintiffs do not dispute, or even address, defendant's evidence that union members, such as Mr. Tagelkhatim, are permitted to orally request leaves of absence from their security managers. *See* Gorski Aff. ¶¶ 4-5. ("[I]t is common practice for a union member to request a leave of absence directly from the company for which he/she performs work, without notifying PPGU."). Indeed, plaintiffs themselves cite to the portion of Mr. Arbab's deposition where he corroborates this fact. *See* Arbab Dep. at 102-03 ("[M]ost of the approval vacation time coverage is through Mr. Karczewski. If someone went, 'Richard, I'm approving vacation,' and my boss tells them okay, he lets me know. He says, 'X, Y and Z is taking off for vacation time, I approved his vacation time. However, I'm not considering this person not available to work."). Plaintiffs also selectively quote from Mr. Arbab's testimony, which, taken in its proper context, reveals that Mr. Arbab learned of leaves of absence from the union in cases where the company asks for the information, but that, when he was constructing his list of unavailable security guards, he orally learned of leaves of absence from his boss, "Richie O'Keefe, from Port Newark Container Terminal through . . . the security manager." *Id.* at 104-05. Plaintiffs also do not acknowledge or dispute the authenticity of Mr. Tagelkhatim's marriage certificate, dated February 14, 2005, and originating from the Sudan. Thus, while plaintiffs assert that defendant "invented after the fact" an argument that Mr. Tagelkhatim was on an approved leave of absence, they provide no relevant evidence to create an issue of fact and rely only on their conclusory argument that "the only reasonable inference is that no security guards were on vacation or leaves of absence during the relevant time period."

Plaintiffs also do not raise an issue of fact as to the other evidence in the record that plaintiffs did not experience disparate treatment on account of their religion but rather that, consistent with defendant's nondiscriminatory reason, their sponsorships were withdrawn because of their unavailability to work. Plaintiffs cannot rely on their conclusory allegation that defendant's reason was false because they "felt . . . [Mr. Arbab] had exercised favoritism towards the Muslim security guards in choosing who would be considered unavailable." Pls.' Br. at 3. That plaintiffs observed Mr. Arbab "regularly spend[ing] time alone with a group of Muslim security guards doing such things as breaking fast during Ramadam" is not evidence that defendant discharged plaintiffs for discriminatory reasons. In their depositions, plaintiffs also testified that the list of security guards who were retained by the company included at least three other Coptic Christians, *see* Salib 6/26/06 Dep. at 126-32; Fahim 7/26/08 Dep. at 195-97, and that the list of unavailable security guards included Muslims as well as Coptic Christians. Plaintiffs argue, however, that the three Muslim security guards who were included on the list had "long since abandoned their jobs by the spring of 2005." Pls.' Br. at 5. However, this fact, rather than establishing that defendant's nondiscriminatory reason for revoking plaintiffs' sponsorship is false, actually corroborates that POPNA chose to terminate those individuals who were not available to work. As plaintiffs themselves point out, none of the three Muslim employees had worked a single hour since 2004.

Plaintiffs also attempt to establish pretext by arguing that defendant, "[f]aced with the total collapse of the position it presented to the EEOC," had "no choice but to advance other explanations for its discriminatory treatment of the plaintiffs" and to "dramatically change[] its story" to fit their alleged business explanation for terminating plaintiffs. According to plaintiffs, defendant originally "gave the impression . . . that it had conducted layoffs in a simple, objective

manner" by revoking the sponsorship of those who had worked the fewest hours," but that it has now moved to a "more vague 'unavailability to work' standard." Pls.' Br. at 2. In so arguing, plaintiffs either mischaracterize or misunderstand defendant's original position statement, which makes clear that Mr. Arbab considered the number of hours worked as part of his determination of which workers were unavailable to work. *See, e.g.*, Burstein Ex. 2 at 2 ("[POPNA's] decision to withdraw its sponsorship of [plaintiffs] was based on . . . business reasons, namely, his failure to make himself available for work, which is well documented by business records."); *id.* at 3 ("[POPNA] evaluated its call lists and decided that it needed to ensure that the individuals on the lists were individuals willing and available to work for [POPNA] as it needed and not at the individual's whim."). The company's position statement does not represent that the number of hours worked was the single determinative factor in determining unavailability.

Plaintiffs' argument that there is evidence of disparate treatment even under defendant's "changed story" fails for the similar reason that their proposition depends on misinterpretations of the record. According to plaintiffs, "an analysis of company time records shows that all of the comparators made themselves 'unavailable to work' notwithstanding their seniority" because, under their interpretation of defendant's nondiscriminatory reason, any security guard who is less senior than another security guard should necessarily work fewer hours. However, plaintiffs' proposition is neither supported by Mr. Arbab's deposition testimony nor the rest of the record. Contrary to plaintiffs' characterization, Mr. Arbab did not simply testify that "if two security guards were making themselves available for work, the more senior of the two would end up working more hours," Pls.' Br. at 10, but, more completely, he testified that "the more senior person is going to have *more opportunities* to work than a less senior person" and that "if you have a more senior person and a less senior person, [and] they're both making themselves

available for work, the more senior person is going to have more hours and the less senior person is going to have less hours." Arbab Dep. at 67-69 (emphasis added); *see also, e.g.*, *id.* at 43-45, 88-90 (testifying that a low number of hours worked was not indicative of availability). Thus, it remains undisputed that defendant did not determine unavailability simply on the number of hours worked, and plaintiffs have failed to establish an issue of fact suggesting that defendant's proffered reason was false or that discrimination was the real reason for plaintiffs' termination.

Plaintiffs' other arguments that ultimately seek to undermine defendant's veracity similarly amount to unsupported and conclusory allegations, which are insufficient to oppose a motion for summary judgment. *See Weinstock*, 224 F.3d at 41; *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986). For example, plaintiffs suggest that defendant's claim that Mr. Arbab was unaware of why Mr. Karczewski requested a list of unavailable security guards is no more than a "self-serving protestation." However, even assuming that Mr. Arbab knew the exact purpose of the list, plaintiffs' suggestion that his goal was to discriminate against them is belied by Mr. Arbab's undisputed testimony that he called plaintiffs to caution them to make themselves more available for work and to inform them that they would be placed on the list.[11]

In sum, rather than producing and pointing to evidence from which a reasonable jury could find that defendant's reason was false and that discrimination was the real reason for their termination, plaintiffs resort to mischaracterizing or avoiding facts in the record. Plaintiffs cannot create issues of fact in this manner. Because no reasonable jury could conclude from the record that defendant's reason, as articulated and supported by record evidence, is a pretext for discrimination, defendant is granted summary judgment on plaintiffs' claim of discriminatory termination.

---

[11] As discussed in the facts section, Mr. Arbab was able to reach Mr. Salib, but not Mr. Fahim.

**B.  Overtime Shifts**

Plaintiffs claim that defendant "regularly assigned longer shifts to Muslim security guards of lower seniority" and argue that "this should not have happened since plaintiffs should have been offered those shifts and would have accepted them."  In support, plaintiffs construct a list that purports to compare the number of hours that they worked on select weekends and holidays between January 4, 2004 and March 20, 2005 with the number of hours logged by Muslim security guards with less seniority.

As with plaintiffs' termination claim, plaintiffs have not produced any evidence indicating that the comparators they have chosen are "similarly situated in all material respects." And again, defendant produces evidence demonstrating that at least two of the comparators were more senior than plaintiffs and therefore necessarily would have had more opportunities to work than plaintiffs.  Defendant also establishes that plaintiffs worked fewer hours on some of the days than the Muslim security guard comparators because plaintiffs were working at a particular port in New Jersey where only eight hour shifts were available.  With respect to Mr. Salib, defendant further establishes that he worked at the New Jersey port pursuant to his own preference and decision to accept assignments there instead of in New York where overtime opportunities were available.

Although the burden at the prima facie step of the *McDonnell Douglas* analysis may be de minimis, plaintiffs have not offered any evidence that there was indeed an adverse employment action or that their alleged denial of overtime work occurred under circumstances giving rise to an inference of discrimination.  Therefore, defendant is granted summary judgment on plaintiffs' overtime claim

.

### C.     Work Assignments

Plaintiffs claim that defendant's records "confirm favoritism in the actual work assignments" distributed to Muslim security guards and cite to one instance on October 20, 2004 when Mr. Salib worked a "Patrol" position from 7:00 a.m. to 8:00 p.m. while Mr. Tagelkatim worked a "Relief" position from 5:30 a.m. to 8:00 p.m.  Plaintiffs argue that the "Relief" position was a more favorable assignment because "a security guard may stay indoors most of the time." Whether plaintiffs' characterization of the assignment types is accurate or not, plaintiffs have not produced enough evidence in support of their claim to escape summary judgment.  It is not enough for plaintiffs to simply state that "[d]iscovery has yielded numerous examples of this sort of discrimination."  The record is devoid of any other evidence, and no reasonable jury could find an inference of religious discrimination on the basis of this isolated example.  Defendant is therefore granted summary judgment on plaintiff's work assignments claim.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment on all of plaintiffs' claims against them is granted.  The Clerk of Court is directed to enter judgment for defendant and to close this case.


SO ORDERED.


_____/s_____
**NINA GERSHON**
**United States District Judge**


Dated:     October 28, 2008
               Brooklyn, New York